JERRY JUNIOR OFFUTT *v.* STATE OF MARYLAND

[No. 569, September Term, 1979.]

*Decided February 7, 1980.*

The cause was argued before MORTON, THOMPSON and LOWE, JJ.

*Patricia A. Logan, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and

*Michael D. Mason, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Jerry Junior Offutt, appellant, was convicted in the Circuit Court for Montgomery County of assault with intent to rob. Judge John F. McAuliffe, presiding with a jury, imposed a sentence of ten years. The various contentions of the appellant will be set out separately.

## I. Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to support his conviction. The important testimony can be summarized as follows:

Kelly Anne Hickey, aged 16, was a part-time employee at Garrison's Toy Store. On November 11, 1978, at 5:30 p.m., a man came in and asked her for change. As she started to open the cash register, he handed her an envelope on which was written "give me call [sic] your money." She did not understand what it meant, and when she looked the man in the face he said, "can't you read?" When she replied, "yes," he said, "give me all your money." She said, "No, you can't have it. It's not mine." She noticed that:

> "He had his hand in his pocket and he — like he had a gun and I guess he wanted me to believe he had a gun and he said, 'Do you want to die?'
>
> "Q. What pocket are you referring to now, his pants pocket?
>
> "A. His jacket pocket.
>
> "Q. Like he had a gun. What made you conclude that, because of the way his hand was in his pocket?
>
> "A. His hand was in the pocket and the way he pointed it up to me and said, 'Do you want to die?' "

The incident concluded:

> "[Miss Hickey]: Well, I thought — I said, 'This is a joke or something,' because I didn't think that, you

know, he would be coming in and robbing Garrison's. I don't have that much money in the register, and then he said, yeah, he was just kidding and he pulled a toy off the shelf and said he would buy that and he put it on the counter.

"Q. Did he buy the toy?

"A. He pulled out some money and said he would pay for it and there was a lot of money in his pocket, and I said no.

"Q. What did you tell him?

"A. I told him he scared me and asked him to leave.

"Q. What, if anything, did he say after that?

"A. He asked me where he could buy some beer and there's a beer place next door and I told him next door.

"Q. And after telling him where the beer store was, what, if anything, else, did you tell him?

"A. I kept telling him to leave and he left but right before he left a little girl walked in the store and I don't know if that's why he left.

"Q. You indicated that at first you were uncertain what the note meant and after a while you thought he was kidding?

"A. Yes.

"Q. Did there come a time during the events of that particular transaction that your opinion changed?

\* \* \* \*

"A. Well, when he asked me did I want to die, that sort of scared me and when he pulled out all that money, it didn't look right."

The police were called, and when they arrived, Detective Thieman showed her a piece of yellow paper that had the same writing as she had been shown. She identified the yellow paper in court. She was also shown photographs by Detective Thieman, and picked one out as possibly being the man,

although she was not sure. She earlier described the man as being six feet tall, 155 to 160 pounds, wearing red and blue plaid pants and a tan jacket.

Jeff Richards, aged 17, was employed at McDonald's. On November 11, 1978, at 4:30 p.m., the following incident occurred:

> "So this man came in and a couple of people and they got in line and I served the rest of the people. And he came up and so he bought some food and after a while, he paid me, and so when I go to my register, he gives me a note that said, 'Give me call [sic] your money.' I said, 'What the heck?' I didn't know what it meant. So he gave it back to me and I said, you know, I don't know what this means. So he says, 'Didn't I say a chocolate shake?' And I said no. I said, 'You owe me two cents,' and he gave me a nickel and I gave him three cents and he left."

Richards described the man as being "about six foot, a little heavy, had a beard, had a mustache." His clothing was "a blue plaid jacket with some red in it and some white, and pants about the same."

According to Richards, Detective Thieman arrived at McDonald's about twenty minutes after the incident. He had in his possession the same note that Richards had seen and which Richards identified at trial. Thieman also showed Richards some photographs, and Richards said he selected one that looked like the man, which photograph he identified at trial. Richards explained that when he picked that photograph, it was because that was "as close as [he] could get" rather than that he was positive that it was the man at McDonald's. Richards recalled that he had seen a lineup in the courtroom and had been unable to identify anyone from that lineup; he did not recall that appellant had been in that lineup. He stated that he could not identify anyone in that lineup because the man at McDonald's had a beard.

Detective William Thieman testified, substantially corroborating Richards' testimony as to his identification of the note. His testimony as to Richards' photographic

identification varied from Richards' own testimony in that, according to the officer, Richards was certain as to the identification.

"A. Mr. Richards was standing in the back room of the McDonald's Restaurant, and he took the photographs and he viewed them as he stood there, looking at them one at a time, placing the top one on the bottom. He stopped at photograph number two. He continued on at photograph number four and I observed and noted in my notes an obvious physiological change in that his breathing became deep, his hands visibly shaking. He looked through the remaining photographs and he returned to photograph number two and said that he thought that was the man. I then asked him, 'Is that the man who passed you the note while you were working?' He said yes, it was. I then asked him had he ever seen this man in the restaurant other than at the time he passed the note, and he said no, he did not. I then asked him if he could testify with competency in court that that is the man who passed him the note earlier. He said yes, he could. I then had him initial the back of the photograph."

Appellant contends that there was no assault as that term is defined in *Williams v. State,* 4 Md. App. 643, 244 A.2d 619 (1968), *cert. denied,* 252 Md. 734 (1969):

"Any attempt to apply the least force to the person of another constitutes an assault. The attempt is made whenever there is any action or conduct reasonably tending to create the apprehension in another, that the person engaged therein is about to apply such force to him. It is sufficient that there is an apparent intention to inflict a battery and an apparent ability to carry out such intention." *Id.* at 647.

He argues that the evidence quoted above did not in fact and could not reasonably have tended to create an apprehension

in Miss Hickey that she would be the victim of force. As to the first proposition, she testified that she was scared; this is, of course, sufficient to support a finding she was scared. The testimony that the appellant put his hand in his pocket and "pointed it up to me and said, 'Do you want to die?' " is sufficient for the finder of the facts to conclude that the victim, Miss Hickey, was reasonably in fear that force would be used against her. *Bland v. State,* 236 Md. 652, 205 A.2d 237 (1964), *cert. denied,* 381 U.S. 946, 85 S. Ct. 1791 (1965).

Secondly, the appellant argues that his criminal agency was not established. The police officer testified that Jeff Richards' out of court identification was positive; a positive out of court identification is sufficient to support the conviction, there being ample other evidence to connect the person identified with the actual crime. *Cousins v. State,* 18 Md. App. 552, 308 A.2d 692, *cert. denied,* 270 Md. 738 (1973).

## II. Evidence of Other Crimes

Appellant contends that the trial judge committed error in admitting the testimony of Jeff Richards over his objection on the basis the evidence of the other crimes as well as the evidence of the defendant's involvement must be clear and convincing under *Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978). We do not read *Cross* as requiring that evidence of the other crime must be clear and convincing. The only requirement is that the defendant's involvement be clear and convincing. If the testimony of the detective is accepted, then that requirement would be sufficiently definite to justify the trial judge in admitting the evidence. The record shows that the trial judge carefully reviewed the evidence both as to its probative value and as to its possible prejudice and concluded that the need for the evidence outweighed its possible prejudice as evidence of another crime. *See also Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976), *Simms v. State,* 39 Md. App. 658, 388 A.2d 141, *cert. denied,* 283 Md. 738 (1978).

Appellant also argues, somewhat incomprehensibly, that there was no crime committed at McDonald's and somehow that would preclude the admission of Richards' testimony

under the other crimes exception. The evidence tended to show that the person at McDonald's was the same person who committed the crime at Garrison's Toy Store; it was, therefore, relevant. If the affair at McDonald's did not amount to a crime, there would have been no reason to exclude it.

## III. Voir Dire Examination

Appellant contends that the trial judge committed error in not requiring his presence at a bench conference at which a juror was examined as required by Rule 724 a, absent a waiver. *Bunch v. State,* 281 Md. 680, 381 A.2d 1142 (1978). The record is not clear as to whether or not the appellant was present at the bench conference. We, therefore, apply the rule of *Haley v. State,* 40 Md. App. 349, 392 A.2d 551 (1978), *cert. denied,* 284 Md. 744 (December 15, 1978), in which we said:

> "Although the appellant was present in the courtroom when the subject bench conferences took place, the record does not show whether or not he was present at the bench during those discussions. We cannot and do not presume he was present from a silent record, but we can and do require, as a matter of state procedure, that the complete facts be brought out in post conviction procedures. We followed this procedure in *Green v. State,* 23 Md. App. 680, 683, 329 A.2d 731 (1974), *cert. denied,* 274 Md. 728 (1975). *Compare Bunch v. State, supra,* and *Redman v. State, supra,* where the records on direct appeal were clear that the accused was not present at critical times. *See also, State v. Zimmerman,* 261 Md. 11, 273 A.2d 156 (1971).
>
> \* \* \*
>
> "The record does not indicate whether or not the appellant waived his rights under Rule 724. This, too, can be determined in post conviction procedures as set out above, if it is first determined that appellant was not present at the bench conferences." *Id.* at 354-55.

## IV. Motion in Limine

Appellant filed a motion *in limine* to preclude the State from offering into testimony as impeachment evidence his conviction nine years earlier for distribution of heroin. The trial judge ruled that this evidence would be admissible. Appellant did not testify, alleging that the reason he failed to do so was because of this ruling of the trial court. We do not reach the question under Md. Rule 1085. We have reviewed the question of whether a motion *in limine* was sufficient to support an appellate review when the evidence is not later actually offered in trial, in two recent cases: *Vergie M. Lapelosa, Ind. v. Cruze,* 44 Md. App. 202, 407 A.2d 786 (1979) and *Ory v. Libersky,* 40 Md. App. 151, 163, 389 A.2d 922, *cert. denied,* 283 Md. 737 (1978). In those cases we reviewed the decisions around the country and found none which recognized a ruling on a motion *in limine* as sufficient to constitute reversible error. We adhere to that rule. Although it is entirely possible that the ruling of the trial judge motivated the appellant not to testify, it is also possible that he had no intention of testifying regardless of the ruling of the trial court on the motion. It is also possible that had appellant testified the State would have changed its position and not used the conviction. We do not rule on academic questions.

We do not regard *New Jersey v. Portash,* 440 U.S. 450, 99 S. Ct. 1292, 59 L. Ed. 2d 501 (1979), as in anyway contrary to our position. In that case the accused declined to testify on the basis that the trial judge ruled on a pretrial motion that he would permit the use of prior testimony before a grand jury as impeachment if the accused testified. He did not testify and was convicted. The New Jersey appellate division reversed the conviction and the New Jersey Supreme Court denied the State's petition for certification of an appeal. The Supreme Court reviewed the decision and affirmed the reversal, holding that the State's argument that the issue presented by Portash was abstract and hypothetical because he did not in fact become a witness was improper because both the trial court and the New Jersey appellate court had

678

specifically ruled on the question. It did nothing to overrule the familiar rule that the federal courts, including United States Supreme Court, respect State procedures in reviewing State proceedings. The failure to present a federal question in conformance with State procedure bars review by the federal courts, so long as the State has a legitimate interest in enforcing its procedural rule. *Michigan v. Tyler*, 436 U.S. 499, 98 S. Ct. 1942, 1951, 56 L. Ed. 2d 486 (1978).

*Judgment affirmed.*
*Appellant to pay the costs.*