571 A.2d 238

**Brian Richard JORDAN**

v.

**STATE of Maryland.**

**No. 716 Sept. Term, 1989.**

Court of Special Appeals of Maryland.

March 28, 1990.

226

James C. Savage, Assigned Public Defender, Rockville (Leslie S. Heimov, Law Student, Washington, D.C., on the brief), for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Thomas E. Hickman, State's Atty. for Carroll County, Westminster, on the brief), for appellee.

Argued before MOYLAN, ROBERT M. BELL and CATHELL, JJ.

ROBERT M. BELL, Judge.

Brian Richard Jordan, appellant, was tried, as an adult, by a jury in the Circuit Court for Carroll County and convicted of conspiracy to commit murder, felony murder, robbery, and conspiracy to commit robbery. He was sentenced to life imprisonment for conspiracy to commit murder and for felony murder and, to ten years each for the robbery and the conspiracy to commit robbery charges. All sentences were ordered served consecutively. Being aggrieved by these judgments, appellant has appealed, raising five issues:

1. Did the trial court err in failing to suppress the Appellant's statement to police after making sufficient findings to establish support for that suppression?

2. Did the trial court err in admitting over objection, testimony relating to ritual games when the effect was highly prejudicial and of no relevance?

3. Was Appellant's trial counsel constitutionally ineffective in failing to move for a reverse waiver of the Appellant's case to juvenile court?

4. Was the evidence insufficient to sustain Appellant's conviction?

5. Did the trial court err in imposing the sentences it did upon the Appellant?

Discerning merit in none of them, save for a merger issue, we will affirm, except that we will vacate the sentence imposed for robbery.

The facts out of which this appeal has arisen are rather complex. Preliminarily, we will set forth a concise statement of facts. We will then supply additional facts, as needed, when we address each issue.

In late October, 1987, appellant was sent to the Sykesville Shelter Home, a juvenile detention center. While there, he met Brian Tracy and Dawn Torres, Tracy's girlfriend, who were also residents of the detention center. Tracy was appellant's roommate. Shortly after his arrival, appellant and Tracy began to discuss running away. In that regard,

they were heard to comment on their intention to escape to California and on how that would be accomplished. The State produced evidence from residents at the shelter that they overheard appellant and Tracy say at times that "if they had to, they'd kill someone, they might take a car and they might kill someone, they might do this and they might do that." Dawn Torres testified that she was told by Tracy that he had a gun and that if he had to he would kill someone to get to California. She also testified that she heard appellant say that he had a knife, with which he would slit someone's throat, if necessary.

Implementation of the escape plan occurred about a month after appellant arrived at the shelter. At that time, he, Tracy, and Torres were picked up, at Tracy's request, by the victim, Richard Purman. After taking them to Tracy's home, where Tracy obtained a gun [1], Purman was directed to a wooded area at Mail and Sam's Creek Roads. Once there, Purman helped appellant and Tracy put the runaways' belongings in a weeded area. As they were returning to the car, Tracy fatally shot Purman in the chest. He then hid the body in the weeds. While Tracy was so engaged, appellant tried to start Purman's car. When that attempt proved unsuccessful, appellant, Tracy, and Torres sought assistance at a nearby home. They were eventually taken to a McDonald's restaurant, from which they called the shelter and obtained a ride. Back at the shelter, Torres told a counselor what had occurred, *i.e.*, that Tracy had killed someone. The police were called and Torres directed them to the location where Purman's car and body were found.

Appellant and Tracy were arrested in the early morning hours. Appellant was ultimately transported to the Maryland State Police Barracks. He was transported barefoot, and wearing only jeans and a tee shirt, despite the 28 degree temperature outside. Within a short time of his

---

1. The testimony was that Tracy went into the house and obtained a bag. The gun, which Tracy showed to everyone, was inside the bag.

arrival, but only after he had been advised of his *Miranda* [2] rights, he made an incriminatory statement. That statement was approximately 1½ hours long.

### 1.

Prior to trial, appellant moved to suppress the statement on the dual grounds that 1) it was involuntarily made and 2) it was taken in violation of his *Miranda* rights. A hearing was held on the motion, at the conclusion of which the court found that appellant had been properly advised and that he made the statement voluntarily.[3] It found, however, that the State had not established by a preponderance of the evidence that appellant had knowingly and voluntarily waived his right to counsel. Consequently, appellant's motion to suppress was granted. Because, however, the court had already found the statement to have been voluntarily made, its suppression applied only in the State's case in chief; in the event appellant took the stand, the State would be permitted to use the statement to impeach his credibility.

At the conclusion of the State's case, appellant moved for reconsideration of the court's voluntariness ruling. At that

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** Underlying this conclusion was the court's determination that neither appellant's presentment to the Commissioner was unduly delayed nor his interrogation unduly lengthy. The court also specifically stated that appellant's treatment was "certainly fair" once he arrived at the State Police barrack. In contrast, the court characterized appellant's treatment by the police while at the shelter as "deplorable and unexplainable." It noted, by way of support:

> When you look at the cuffs that were on too tight, the amount of time they were on, the transportation to the barracks at 23 degree or thereabouts weather, cold weather, or without adequate clothing, the length of time from the time they were initially awakened to the time that this statement was taken, the length of time that the cuffs were on in the overtightened condition, the manner in which he was·brought from the trooper's car to the barracks in the parking lot, would certainly weigh heavy in the defendant's favor as to the inhumanity of his treatment from the time of his arrest up to the point of interrogation.

> These additional facts are also significant: appellant was 16 years old, of average intelligence, and had no prior criminal record.

time, he indicated that, but for that ruling, he would take the stand and testify in his own behalf. He did not, however, proffer his testimony. The court reiterated its prior ruling.

Appellant maintains that the court's voluntariness ruling was error. In his view, the totality of the circumstances indicate that he made the statement involuntarily. Although it takes the opposite view, *i.e.*, that the totality of the circumstances amply demonstrates the voluntariness of the statement, the State questions whether the issue has properly been preserved for our review. Because we agree that it has not, we need, and will, not address the merits of the issue.

■ The court ruled that the State's failure to prove compliance with *Miranda* rendered appellant's statement inadmissible in the State's case in chief. On the other hand, its ruling that the statement was voluntarily made allowed the State to use it to challenge appellant's credibility should he testify in his own behalf. *See Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). Appellant, as we have seen, elected not to testify; hence, the statement was never used in the case for any purpose. Therefore, the issue simply has not been properly presented for our review.[4] *See Offutt v. State,* 44 Md.App. 670, 410 A.2d 611 (1980), *cert. denied,* 291 Md. 780 (1981). *See also Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

One of the issues presented in *Offutt,* was the reviewability of a court's ruling, on a motion *in limine,* that a prior conviction for distribution of heroin was admissible as impeachment evidence should the accused testify. The ac-

---

**4.** This situation is to be contrasted with that contemplated by Maryland Rule 4–323(c). Here, appellant has obtained the relief—suppression of the statement—he sought. The court's ruling that the statement is nevertheless usable for impeachment purposes should appellant testify is in the nature of an advisory opinion. As we see it, its applicability in a particular case cannot be determined until appellant has testified; only then will it become apparent whether anything, requiring impeachment, has developed.

cused did not testify, offering the court's ruling as his reason for not doing so. We held that the question was not ripe for review, reasoning:

> Although it is entirely possible that the ruling of the trial judge motivated the appellant not to testify, it is also possible that he had no intention of testifying regardless of the ruling of the trial court on the motion. It is also possible that had appellant testified the State would have changed its position and not used the conviction. We do not rule on academic questions.

44 Md.App. at 677, 410 A.2d 611.

*Luce v. United States* is to like effect. There, the accused moved in limine to exclude the use of a prior conviction to impeach him should he elect to testify. The court ruled the conviction admissible, depending upon the nature and scope of the accused's trial testimony. The accused did not testify; indeed, he made no commitment that he would have testified had the motion been granted. Nor did he proffer his testimony. The Court of Appeals for the Sixth Circuit held that the court's ruling on the motion *in limine* was not reviewable. The Supreme Court affirmed. It pointed out:

> Any possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling. On a record such as here, it would be a matter of conjecture whether the District Court would have allowed the Government to attack petitioner's credibility at trial by means of the prior conviction.
>
> When the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction. If, for example, the Government's case is strong, and the

defendant is subject to impeachment by other means, a prosecutor might elect not to use an arguably inadmissible prior conviction.

469 U.S. at 41–42, 105 S.Ct. at 463–464.

Under a factual scenario almost identical to that in the instant case, the Supreme Court of New Hampshire reached the identical result. In *State v. Bruneau*, 131 N.H. 104, 552 A.2d 585 (1988), the accused, by motion *in limine*, filed before trial, claiming a violation of *Miranda*, successfully moved to suppress a statement he had given to the police. The court ruled, as did the court in this case, that the statement was nevertheless admissible for impeachment purposes should the accused take the witness stand. The accused did not testify. On appeal, he challenged the court's "ruling that [his] statements … obtained in derogation of State and federal rights to counsel, could be used to impeach him if he took the stand." 552 A.2d at 586. The Court did not reach the merits of the challenge since the accused did not take the stand and suffer impeachment by the statement's use.[5] It explained:

> … Assuming *arguendo* that the defendant raised an issue involving post-indictment State and federal rights to counsel, we find the claim of prejudicial error too speculative for adjudication. The defendant never testified and was never impeached. We have no way of knowing whether his decision to remain off the stand was influenced to any degree by the ruling *in limine*, any more than we can tell what would have happened if he had testified. We do not know whether his testior whether the State would actually have used the statement to impeach him.

552 A.2d at 592.

In the instant case, appellant proffered that, but for the court's ruling he would have testified. Therefore, he sug-

---

5. In addition to the rationale, *infra*, the Court noted that the specific theory advanced on appeal had not been presented to the lower court. For that reason, as well, the issue was not before it. 552 A.2d at 592.

gests, there is no speculation involved in determining whether the court's ruling precipitated his decision and thereby prejudiced him. We do not agree. The connection between the court's ruling and appellant's decision to refrain from testifying is no less speculative because appellant proffers that he elected not to testify solely because of the court's ruling than it would be had he not so proffered. In either case, the court may have changed its ruling or the appellant's testimony may not have produced the factual predicate which would have permitted use of the statement for impeachment purposes. This is particularly so where, as here, no proffer has been made as to what the testimony would have been; under the circumstances it is pure speculation that appellant's testimony, had he taken the stand, would have generated an impeachment issue.

We are aware of *Passamichali v. State*, 81 Md.App. 731, 569 A.2d 733 (1990). The issue presented in that case was the constitutionality of Maryland Courts & Jud.Proc.Code Ann. § 10–905. In an effort to raise that issue, the accused "[made] clear that [he] chose not to testify solely because of the pending admission of his robbery conviction." We held that appellant's constitutional claim had thereby been sufficiently preserved for appellate review. We reasoned:

> It defies logic to suggest that a defendant must testify in order to preserve for appellate review a claim of deprivation of the constitutional right to testify. If such a requirement existed, this constitutional challenge could never be squarely presented for appellate review because the claim would dissipate upon the defendant taking the oath. In the case *sub judice*, there was no factual determination to be made which would have required appellant to take the stand. The issue was a purely legal one—the constitutionality of § 10–905—and as Justice Brennan stated, to require appellant to testify in order to preserve the issue is inappropriate. We hold that appellant adequately preserved his constitutional claim by noti-

fying Judge Bothe of his desire to testify and of the sole reason for his refusal to testify.

81 Md.App. at 740–741, 569 A.2d 733.

### 2.

Appellant moved *in limine* to exclude from the trial any evidence of "alleged occult or satanic activities", such evidence being irrelevant and highly prejudicial. During the argument on the motion, appellant proffered that the "occult activities ... involved ... some sort of game playing or—I believe the game is entitled Runes, where the individuals took part in the game, that questions were posed concerning what they should do." Having heard extensive argument on the subject, including the State's proffer of the evidence it intended to offer, the court denied the motion, but not before expressing a real concern as to the admissibility, in general, of evidence concerning appellant's occult activities. Specifically, the court stated:

... Assuming all other things—the proper foundations are laid. What I would suggest, gentlemen, is that—I—I will deny the motion *in limine*, at this point, with a—a very—with a caution that the business of Satanism, *per se*, the fact that they worship—in other words, their religious—or the defendant's religious belief, unless it's shown or can be proffered that it's going to be the proximate cause for the motivation of the crime or some other relevant issue, I think the State would be on very dangerous ground getting into that; however, that doesn't mean that it can't develop at some point in the trial, then may become admissible.

The issue surfaced again, just prior to the State calling John Saylor, its main witness to the Runes games played by appellant and Tracy. At that time, appellant sought reconsideration of the court's prior ruling and, in particular, "... that the court hear the testimony as to the—out of the hearing of the jury, as to whether or not particular testimony regarding a particular Runes game is going to be admissible because of its prejudicial nature." Agreeing, the

court heard the testimony out of the presence of the jury. It then heard, once again, extensive argument by counsel. During his argument, appellant's counsel clarified his position:

What I am seeking to exclude, I'd suggest to the court is the—the Runes game associated with the ritual, because therein lies the prejudice. As far as his limited testimony is concerned, in terms of other Runes games, where there were questions, "should we steal? should we run to California?", that is not the thrust of the motion. The thrust of the motion is only that part of the Runes game that's associated with the—the alleged satanic rituals. . . .

Once again, the court denied the motion and, once again, it emphasized that there should be no reference to satan or the devil in testimony.

Before the jury, John Saylor testified concerning the Runes [6] games, as follows:

Q. Now, did there come a time when you witnessed the game of Runes with Brian Tracy and Brian Jordan?

A. Yes.

Q. Okay. Now, where did this game take place?

A. Well, there were several games. Some of 'em were in the open, with everybody, and there were others that were in the bedroom that they were in.

Q. Okay. Now, in the bedroom they were in, did you see a game late at night?

A. Yes.

Q. All right. Now, about what time of night is that?

A. There were two. One was just before midnight, and one was some time between one and two o'clock.

Q. In the morning?

A. Uh-huh.

Q. Okay. But, that was all one evening?

A. Yes.

---

6. Runes are small ceramic tiles which have inscriptions drawn on them and which are interpreted by use of an accompanying book.

Q. Okay. Now, in playing this game of Runes, where did they play it?

A. Just right in the bedroom.

Q. But, where in the bedroom?

A. I don't recall exactly.

Q. In other words, on the—on a bed or on the floor or on the wall—how do you do that? What did they do?

A. You just—you just draw one out of the bag.

Q. Okay.

A. I don't remember whether they were sitting down on the bed or ...

Q. Okay. And, had they drawn something on the floor?

A. Yes.

Q. All right. And—what ...

A. There were—there were concentury uh [sic] circles about five to six feet across, drawn on the floor, with a star inside.

Q. Inside the circles?

A. Uh huh.

Q. Okay. And, then, what did they do with these Runes?

A. They were drawn out and depending upon what position they were drawn out in they were supposed to indicate an answer to questions.

\* \* \* \* \* \*

A. Each of the—each of the Runes is supposed to be—and pictured in a certain way, if you pulled it out one way, it—it's right side up, and if its the other way, its upside down. If it's right side up, it means yes. If it's upside down, it means no.

Q. Okay. Now before midnight, they were doing something with either Runes?

A. Yes.

Q. And what was that?

A. They were asking the Runes questions about if they ran away would they succeed and just asking general advice about running away.[7]

\* \* \* \* \* \*

Q. Okay. Now this—at 11:30, th—what kind of questions were they asking?

A. They asked if—if they ran away, would they—would they succeed in getting to California, and if they held a ritual, would it succeed.

Q. Okay. Any other questions that they asked as you can recall?

A. Not that I specifically recall.

Q. Okay. So, now, after midnight, there was another Rune session.

A. Right.

Q. Okay. And—who was present at this?

A. Brian Tracy, Brian Jordan, and myself.

Q. Okay. And, who was pulling the Runes out? Was anybody in particular pulling the Runes out?

A. I recall Brian Tracy doing it for sure, but I don't know whether Brian Jordan did or not.

Q. Okay. And what questions—what did they do then? What was—describe this session.

A. They repeated the same questions as before and Brian Tracy also asked if he ran away, would Dawn Torres come with him.

\* \* \* \* \* \*

Q. What other questions—what other subjects did they ask about, John?

A. They asked if the ritual would work and part of the ritual for the cars to appear in the parking lot, and they

---

**7.** Appellant's request for a time reference was met by uncertainty as to the date on which the Runes game was played. The closest the witness came was that it was "sometime about a week before [they ran away]".

asked whether—if that would work and if the cars would appear.

Q. Okay. Anything else about the cars?

A. No.

Q. Okay. Now did there come a time when they asked the questions in regard to this escape—or this leaving?

A. Well that was what the whole point of the ritual was, to help them to escape.

Q. Okay. And, did they ask specific questions leading to that?

A. At—I remember, at one point asking them—they asked—well, I'm not sure who it was. I think it was Brian Tracy, but one of them asked about stealing the car. I don't remember exactly when this happened, though.

 \* \* \* \* \* \*

Q. Did they—aside from this, do you know what the Runes told them by the way?

A. I don't remember the answers. I remember that most of them were positive and that, at some point, Brian Jordan said to me that he no longer believed in the Runes, because they always said yes, but things didn't seem to be working out for them.

The Runes were introduced into evidence, without objection.[8]

 Evidence is relevant if it tends to make a material issue in the case more probably true or untrue. *See State v. Allewalt,* 308 Md. 89, 101, 517 A.2d 741 (1986); *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976). Evidence that is relevant may be excluded however, if its probative value is substantially outweighed by its prejudicial effect.

---

8. Appellant did not object during this testimony, nor during the testimony of the other State's witness who testified on the subject. Thus, the State maintains, noting appellant's clarification of the nature of his objection, that appellant has failed to preserve the issue he now presents on appeal for our review. While persuasive, we will nevertheless assume, but not decide, that the issue has been preserved.

*Straughn v. State,* 297 Md. 329, 333–34, 465 A.2d 1166 (1983); *Cross v. State,* 282 Md. 468, 474, 386 A.2d 757 (1978); *Harris v. State,* 81 Md.App. 247, 285, 567 A.2d 476 (1989). The trial court determined the evidence to be relevant to the conspiracy counts and on that basis, it was admitted. We agree. Moreover, we hold that the court did not abuse its discretion in admitting the evidence over appellant's objection premised upon its prejudicial value. We also reject appellant's argument that the Runes game evidence was an attack on appellant's character prior to its having been placed into issue by appellant. Aside from the fact that it is not at all clear that the effect of the admission of the evidence was to establish appellant's bad character, the evidence was, as we have already held, substantially relevant for another purpose, *i.e.,* the establishment of the conspiracy counts of the indictments. *See Harris v. State,* 81 Md.App. at 256, 567 A.2d 476.

### 3.

Appellant next challenges the effectiveness of the assistance rendered him by his trial counsel. In support of his contention that his counsel was incompetent, he relies on counsel's failure to move, pursuant to Maryland Code Ann. Art. 27, § 594A and Maryland Courts & Jud.Proc.Code Ann., §§ 3–804(d)(1) and 3–817(d)(1)–(5), that he be reverse waived to juvenile court, notwithstanding counsel's development of evidence which indicated appellant was a fit subject for juvenile rehabilitative measures. We do not agree.

■ Ordinarily, the effectiveness of counsel is properly raised and determined in post conviction proceedings, rather than on direct appeal. *See Johnson v. State,* 292 Md. 405, 434, 439 A.2d 542 (1982); *Bratt v. State,* 62 Md.App. 535, 538, 490 A.2d 728, *cert. denied,* 304 Md. 95, 497 A.2d 818 (1985). This is so because in the ordinary case, sufficient facts have not been developed to enable the court adequately to resolve the issue. *Johnson,* 292 Md. at 434–35, 439

A.2d 542. That is not the case here, however. Thus not only will we address the issue, we reject it.

■ Maryland Code Ann. Art. 27, § 594A(b) provides: (b) *Certain causes not transferrable.*—The court may not transfer the case to the juvenile court under subsection (a) if:

(1) the child has previously been waived to juvenile court and adjudicated delinquent;

(2) the child was convicted in another unrelated case excluded from the jurisdiction of the juvenile court under § 3–804(e)(1), (4), or (5) of the Courts and Jud. Proc. article; or

(3) the alleged offense is murder in the first degree and the accused child is sixteen or seventeen at the time the alleged offense was committed.

Appellant was charged with, *inter alia,* first degree murder and he was sixteen at the time the crime was committed. Therefore, he fits squarely within the exclusion of § 594A(b)(3). Because he was thereby ineligible, counsel's failure to move for reverse waiver could not constitute ineffective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–67, 80 L.Ed.2d 674 (1984); *Harris v. State,* 303 Md. 685, 697, 496 A.2d 1074 (1985).

### 4.

The sufficiency of the evidence to sustain his convictions is the focus of appellant's next argument. Considering the conspiracy counts together, and correctly defining "criminal conspiracy", *see Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988), appellant maintains that the State failed to establish the existence of a plan or agreement between appellant and Tracy. Specifically, he says that the State sought to prove the conspiracies by reference to the murder itself and, thus, the only evidence of conspiracy pertained to past, rather than future, acts. Moreover, appellant contends that the robbery conviction suffers from the same flaw. In that regard, he argues:

The testimony of Dawn Torres supported the fact that both she and appellant were surprised by the shooting and killing of Richard Purman by Brian Tracy. After the murder had occurred, it is undisputed that appellant took the keys that were in the ignition and attempted to start Richard Purman's car. However, there was no testimony that would relate to the violence to the person of Richard Purman and the attempted taking of his property. By failing to establish the sequence and the participation of the appellant, the State has failed to establish sufficient evidence to support the conviction for the robbery which underlies the conviction for the felony murder.

As is evident from the above argument, it is appellant's contention, and we believe rightly so, that failure to sustain the conviction for robbery is necessarily fatal to the felony murder conviction [9].

As a threshold matter, appellant's argument that the evidence is insufficient to sustain the conspiracy to commit murder conviction is made for the first time on appeal and, consequently, is not properly before us. Addressing that count in the court below, appellant expressly conceded the sufficiency of the evidence to prove it:

\* \* \* \* \* \*

The State's evidence shows that the plan to kill Richard Purman was a plan detailed earlier on the day of the crime by Dawn Torres, and that plan was that Brian Jordan was to stab Richard Purman with a knife. There was no evidence, at all, that it was ever the plan to shoot Richard Purman.

Now, in the event, which has been described by the State's main witness, Brian Jordan is seen with the knife. Dawn Torres also testified that he, apparently, could not

---

**9.** Before the trial court, appellant argued in support of his motion for judgments of acquittal that there was insufficient corroboration of the accomplice testimony provided by Torres. This argument was specifically made applicable to all outstanding counts. Appellant does not pursue that issue on appeal, however.

get the knife out of his sleeve because of some bracelets that he was wearing, at the time, and that apparently there was conversation that Brian Tracy shot Richard Purman before Brian Jordan had an opportunity to stab him. Now, on this evidence, Count 2, dealing with the conspiracy is—to murder is clearly made out, because the conspiracy would be made out at the time the original plan was made. So, there was a conspiracy to kill Richard Purman by the use of a knife.[10]

As is evident from the foregoing, the only difference between the position espoused by the State and that conceded by appellant is the method by which the murder was to be committed.

 The test of the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original) *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Bloodsworth v. State,* 307 Md. 164, 167, 512 A.2d 1056 (1986). Simply stated, appellant's argument concerning the conspiracy counts is that there is no direct evidence of an agreement which pre-existed the acts done in accomplishment of the objects of the agreement. To be sufficient proof of a conspiracy, the evidence need not be direct; circumstantial evidence will do just as well, so long as the existence of a conspiracy is a rational inference to be drawn from that evidence. *See Finke v. State,* 56 Md.App. 450, 468–78, 468 A.2d 353 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218, *cert.* denied, 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984). There was ample evidence in this case

---

**10.** Appellant later qualified his reference to the State's evidence by adding the phrase, "if the jury chooses to believe it". That qualification does not render his concession any the less effective. It is obvious that the jury did, indeed, believe the State's evidence.

In fact, it is clear from the context that appellant's counsel's qualifications related not to the existence of the agreement but to the events that allegedly transpired pursuant to the agreement.

from which the trier of fact could have concluded that appellant conspired with Tracy to commit robbery. Accordingly, we reject that argument.

■ To preserve an issue for appellate review, it must first have been presented, with particularity, to the trial court. *See* Maryland Rule 4–324; *Lyles v. State,* 308 Md. 129, 135, 517 A.2d 761 (1986); *Brooks v. State,* 68 Md.App. 604, 611, 515 A.2d 225 (1986), *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987). Regarding the robbery conviction, appellant did not present to the trial court the argument he now makes on appeal Consequently, it is not preserved for our review.

■ In the lower court, appellant's major argument was directed toward the charge of premeditated first degree murder. He contended that there was insufficient evidence to establish that appellant was a principal in the second degree, *i.e.,* to show that he aided, abetted, counseled, encouraged, or commanded the commission of that offense. He argued, in that regard:

> With respect to the other counts in this case, specifically, Count 5, which alleges first—felony murder; Count 6, which alleges robbery with a deadly weapon; Count 7, which alleges conspiracy to rob with a deadly weapon; and Count 9, which alleges robbery, as well, this same analysis applies, because the State's witnesses have testified that the intention was that this individual would slash and/or—slash the victim and rob the car. Tracy beat him to the punch, according to Dawn Torres's testimony. For that reason, the same analysis, with respect to the first degree murder count, would apply to the robbery, as well. Tracy took it on his own to do it, and while he may be guilty, again, vicariously, he is not guilty as an accomplice, as a principal in the second degree....

Even if, however, the argument in appellant's initial brief can be read as suggesting that the robbery count must fail because of a failure of proof of asportation of the automobile, it is unavailing since appellant, as we have seen, did

not raise that issue in the court below. And since appellant's argument as to the felony murder charge is intricately intertwined with his argument concerning the robbery conviction, which we have rejected, it too must be rejected.

### 5.

The final challenge mounted by appellant is directed at the sentences he received. According to him, imposition of two consecutive life terms, consecutive to two consecutive ten year terms constituted excessive punishment, in violation of the Eighth Amendment and, in any event, the substantive counts and the conspiracy counts should have been merged. In support of the former, appellant relies upon his view of the evidence, which he believes demonstrates that his culpability was not so great as that of Tracy. He also points out that the sentences he received greatly exceeded those recommended by sentencing guidelines.

We will address appellant's merger arguments first. As we have seen, appellant was convicted of felony murder, but acquitted of premeditated murder. Therefore, he should not have been sentenced for both felony murder and robbery. *State v. Frye*, 283 Md. 709, 716, 393 A.2d 1372 (1978). The State properly concedes the point. This resolves, or at least renders moot, appellant's argument that the robbery conviction should merge into the conviction for conspiracy to commit robbery.

Appellant further contends that the State proved only one conspiracy with multiple objects and, consequently, he should only have been sentenced for one conspiracy. This argument is belied by what occurred below. Appellant did not object to two conspiracy counts being submitted to the jury, and the issue was not raised when he moved for judgment of acquittal. Moreover, appellant did not except to the conspiracy instructions given the jury. Even when the jury had returned verdicts of guilty as to each of two conspiracies, appellant still did not bring to the court's attention the contention he now makes that there was only

one conspiracy. Notwithstanding, appellant suggests that we treat the court's failure to present the issue of the number of conspiracies properly to be considered by the jury plain error.[11] We are not persuaded that it is plain error. *See State v. Hutchinson,* 287 Md. 198, 202–03, 411 A.2d 1035 (1980); *Booth v. State,* 62 Md.App. 26, 37–38, 488 A.2d 195 (1985), *aff'd on other grounds,* 306 Md. 313, 508 A.2d 976 (1986). Thus, we decline to consider the issue further.

We find no merit in appellant's excessive sentence argument. There is no dispute, the sentences are within the statutory limits. When sentences are within the statutory limits, the fact that they are made to run consecutively does not render them, either separately or collectively, cruel and unusual punishment. *See Teasley v. State,* 298 Md. 364, 370, 470 A.2d 337 (1984). Nor does the court's refusal to follow the guideline sentence render the sentence imposed, one motivated by ill will, prejudice or other impermissible considerations. In this case, the court explained its reasons for imposing the sentences it did.

SENTENCE FOR ROBBERY VACATED; ALL OTHER JUDGMENTS AFFIRMED.

COSTS TO BE PAID ONE–FOURTH BY CARROLL COUNTY AND THREE–FOURTHS BY APPELLANT.

---

11. In a letter directed to the panel, appellant conceded that the issue was not raised or determined below and requested an opportunity to brief it prior to decision being rendered in this case. Although appellant's counsel advises us that the State does not object, we exercise our discretion to deny the request.