675 A.2d 1037

**Paul Andrew WILLIAMS**

v.

**STATE of Maryland.**

**No. 1334, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 7, 1996.

4

6

Deanna L. Zakes (Stephen E. Harris, Public Defender and John L. Kopolow, Asst. Public Defender, on the brief), Baltimore, for Appellant.

Diane Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for Appellee.

Argued before BLOOM, DAVIS and EYLER, JJ.

EYLER, Judge.

A jury, sitting in the Circuit Court for Baltimore City, found Paul Andrew Williams, appellant, guilty of: Count one, malicious biting with intent to mark or disfigure; Count two, malicious biting with intent to maim, disfigure, or disable; Count three, robbery; and Count four, possession of controlled paraphernalia. The circuit court sentenced appellant to twenty-nine years of incarceration as follows: four years' imprisonment for Count four; ten years' imprisonment for Count three, to run consecutively to the sentence imposed for Count four; and, for Counts one and two, two fifteen year terms of imprisonment, to run concurrently to each other and

consecutive to Counts three and four respectively. Appellant noted an appeal to this Court, wherein he presents six issues for our consideration and resolution.

1. Did the trial judge err in admitting evidence of the alleged assault's mental, psychological and behavioral effects upon the victim?

2. Did the trial judge's refusal to rule on the admissibility of Appellant's prior convictions before he made his election to testify or remain silent improperly coerce his decision not to testify?

3. Was the evidence insufficient to sustain the conviction for robbery?

4. Was the evidence insufficient to sustain the convictions for malicious biting with intent to mark or disfigure and malicious biting with intent to maim[,] disfigure[,] or disable?

5. Did the trial judge err when, despite the State's discovery violation, he refused either to exclude the testimony of the State's expert witness or to grant a continuance sufficient to enable the defense to find an opposing expert?

6. Must either malicious biting with intent to mark or disfigure or malicious biting with intent to maim, disfigure, or disable be merged?

 .After reviewing the record, we are convinced that the circuit court committed reversible error when it improperly advised appellant that the circuit court would not review, outside of the jury's presence, the admissibility, for impeachment purposes, of appellant's prior convictions unless appellant first irrevocably "elected" to waive his Fifth Amendment right against self-incrimination by being sworn in front of the jury. Although we are reversing the circuit court's judgments as discussed in II *infra*, we shall address several of appellant's other contentions in order to guide the trial judge in the event of retrial and to avoid the expense and delay of another appeal. *See Bedford v. State*, 317 Md. 659, 668, 566 A.2d 111 (1989); *Midgett v. State*, 216 Md. 26, 38, 139 A.2d 209 (1958).

James Caple, the victim of appellant's attack, testified at trial. Caple, who was running an errand for his daughter on

September 23, 1994, recounted to the jury what transpired on that morning.

> Well, I had dropped my, taken my daughter to work, and she had asked me to stop there to pay her cable bill for her. When I stopped to pay the cable bill, I parked the car maybe three cars away from the cable company, and I walked up to the cable building, and this gentlemen [appellant] was there trying to sell a cable box. So, he asked me [if I wanted to purchase the] cable box. I told him no, and so a couple of more peoples [sic] was walking out at the time. He tried to sell it to them and they wouldn't buy it. So what he did is when I moved into the line, I got into the line to pay the bill. It was a lady in between me and him, and he came back around behind where I was, but he couldn't get behind me, so he moved to a window where I had to pay the bill at, and he stood there like he was writing something down. And as soon as I walked up to walk out to pay him [the cable company representative], I had the money, the bill in one hand and the bill in the other hand [sic], he walked up, too, but I thought it was somebody who knew one of my sons or something, because he said, give me the money, and I figured it was somebody playing with me, because peoples [sic] is always approaching me, you know, young guys, and then he grabbed me and pushed me, and when he pushed, he had to walk between some ropes, and I fell, and he put his feet on me like to kind of keep me down to get the money from me, and I got up and throwed him off of me, and got up. And when I got up, he started biting me. He bit me up side of my face and bit my finger, this finger here almost in two, and bit on this, these marks here is where he bit me. I had a mark on my face. And that's about the size of what he did.

As a result of the attack, Caple lost significant use of his ring finger; in fact, he testified that he no longer can wear a ring on that finger. He testified that he had in his hand $60 to $70, which tore in half during his struggle with appellant; Caple retained one half of the money and appellant the other when bystanders separated them. Over appellant's objection, Caple

testified as to the psychological impact on his life caused by appellant's attack.

Other eyewitnesses testified at trial in substantial conformity to Caple's recitation regarding the aforementioned events. No one testified that appellant, who, in his opening statement alluded to his history of seizures,[1] appeared to be in the throes of a seizure either before, during, or after the attack. The one expert who testified at trial, Frank Eisenberg, M.D., explained to the jury that organized action (*e.g.*, speech and motor activity) does not take place during a seizure.[2]

> [I]f you remember[,] the medical definition of a seizure disorder is the disorganized firing of neurological roots in the brain. The one criteria for seizure is that the firing is disorganized. If there's any activity, if there's any motor activity or if there's any behavior, if there's any speech, if there's any sort of action directed by speech that even gives a glimmer of being organized, it is not a seizure. No question, no problem, it's been 20 years that they [the medical community] have been debating this, and there's no disputes. Not since 1973 when it was decided in this country that that will not be called a seizure.

We shall discuss additional facts as warranted.

## I.

During the motions hearing prior to trial, appellant brought several issues to the circuit court's attention. One of those

---

1. Appellant's counsel informed the jury, in part, that appellant sustained severe head injuries during a train collision, and suffers from seizures as a result of said injuries.

 About eight years ago he was involved in a train accident, an Amtrak accident, and you may have heard it. It happened in Chase, Maryland, and several people were killed. Mr. Williams, he was fortunate enough to survive, but he did suffer a severe head injury. And with that head injury, he does suffer from seizures, seizures that wrack his body violently, seizures that make him clench his teeth, seizures that make him unconscious and he doesn't know what he is doing sometimes.

2. The circuit court accepted Dr. Eisenberg as an expert in the field of psychiatry and seizures.

issues pertained to the psychological effect of the attack upon Caple. The circuit court denied appellant's motion concerning testimony to be elicited at trial from Caple and his daughter describing the effect of the attack on Caple's mental and psychological state.

At trial, Caple and his daughter testified, respectively, over appellant's objection, to the impact that appellant's attack had on Caple's psyche. The circuit court admitted the evidence based on its conclusion that Maryland Code, Article 27, §§ 386 encompassed mental *as well as* physical disability.

> THE COURT: [3]86 is the intent to disable, and it says, or disable and I believe that that's broad enough to include a mental disability as well as a physical disability. I have looked at the annotations, and counsel have not brought my attention to any other annotation.

> . . . . .

> I think the way the statute is written it could include both ph[ys]ical and mental. . . .

Appellant contends that the circuit court's reading of § 386 was in error and that the circuit court's ruling on this issue effectively allowed the State to introduce victim impact evidence normally admissible [if at all] only in sentencing proceedings.[3] Appellee, on the other hand, suggests that § 386 could reasonably be interpreted to include mental disability. As a fallback position, appellee submits that any error committed by the circuit court was harmless beyond a reasonable doubt because, among other things, the circuit court instructed the jury that the crime required an intent to cause physical injury; the jury was instructed not to be "swayed by sympa-

---

3. The "sentencing phase implicates issues different from those which predominate at the guilt phase of trial. . . ." *Evans v. State,* 333 Md. 660, 693, 637 A.2d 117 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994); Md.Code (1957, 1992 Repl.Vol., 1995 Supp.), Art. 27, §§ 413(c)(1)(v), 643D; *see* Md.Code (1957, 1993 Repl.Vol.), Art. 41, § 4–609(d).

thy, prejudice or public opinion;" and there was overwhelming evidence of appellant's guilt.

Our inquiry begins with an examination of Article 27, § 386.

If any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or shall unlawfully and maliciously stab, cut or wound any person, or shall assault or beat any person, with intent to maim, disfigure or disable such person, or with intent to prevent the lawful apprehension or detainer of any party for any offense for which said party may be legally apprehended or detained, every such offender, and every person counselling, aiding or abetting such offender shall be guilty of a felony and, upon conviction are subject to imprisonment for not more than 15 years.

Finding no explicit or implicit reference to psychic injury in § 386, we turn to cases interpreting that section.

Judge Orth, writing for the Court of Appeals in *Hammond v. State,* 322 Md. 451, 588 A.2d 345 (1991), concluded that the General Assembly did not change the common law requirement that the maiming, disfigurement, or disablement spoken of in § 386 be permanent. In reaching that conclusion, Judge Orth detailed the legislative and common law history of §§ 384, 385, and 386. In relevant part, he stated:

[S]ection 386 is one of a package of three statutes grouped under the subtitle "Maiming" in Article 27. The other two are now codified as §§ 384 and 385. The statutes stem from the early English common law offense of mayhem. . . .

It is apparent on the face of § 385 that it contemplates the old crime of mayhem as broadened by the early English statutes. Section 385 and the English common law after Sir John Coventry's unpleasant experience speak in terms of the same types of injuries. Thus, the Legislature has covered the field of mayhem. Section 384 encompasses the old common law crime; § 385 proscribes conduct in terms of the common law offense as broadened; § 386 creates a

new offense of assault with intent to maim, disfigure, or disable....

[T]he intent to maim reflects the crime of mayhem, and the intent to disfigure and the intent to disable, in the context in which they appear, are inexorably bound to that crime. We cannot conceive that the Legislature, in proscribing an assault with intent to maim, disfigure or disable, thereby divorced disfigure and disable from the crime of maiming [in relation to the permanency requirement].

*Id.* at 455–59, 588 A.2d 345. The common law and statutory history of the maiming statutes, as recounted by the commentators quoted by Judge Orth, makes no reference to psychic injury: all references are to physical injury. *Id.* at 456–58, 588 A.2d 345.

Addressing a tangential argument made by the State, and instructive for our purposes, Judge Orth found no merit to the proposition that the disablement may be temporary, as in the case of mental disability or disability under Workers' Compensation law.

Mental disability and disability under the workers' compensation law have absolutely nothing to do with disablement by maiming, and are of no significance whatever in divining the legislative intent as to § 386.... [T]he State simply avoids any discussion of the steadfast recognition, harking back to the first violent deprivation of the use of those members [of the body] as may render a person less able in fighting, that the deprivation must be permanent.

*Id.* at 465, 588 A.2d 345. The State had argued that the concept of disability is common to the law, and the interpretation of such should not be limited to the context of maiming and statutory maiming. *Id.* at 464, 588 A.2d 345.

Judge Orth's reasoning and recitation in *Hammond* of the common law and statutory history of the maiming statutes, in conjunction with the precept that criminal statutes are to be strictly construed in favor of the accused and against the State, *Collins v. State,* 89 Md.App. 273, 293, 598 A.2d 8 (1991), lead us to hold that § 386 requires an intent to cause

physical injury and that the circuit court abused its discretion when it allowed the State to present evidence at trial of Caple's psychic injury. *Whittlesey v. State*, 340 Md. 30, 87, 665 A.2d 223 (1995) ("In reviewing objections based on relevance, great deference is afforded the trial judge in regulating the conduct of a trial.").

Caple and his daughter testified at length as to Caple's psychic injury. In addition, hospital records admitted at trial included statements that Caple made in reference to his mental health. Moreover, although the circuit court did not mention psychic injury when it instructed the jury on this charge,[4] appellant's counsel, during his closing argument, brought the matter to the jury's attention,[5] as did the State in its rebuttal argument. In part, the State made the arguments that follow.

> She said, the defense attorney told you that this was just a question of, do you believe Mr. Caple's word or do you believe the defendant's word. Mr. Caple was paranoid, delusional, depressed prior to this incident. Number one, you heard from his own daughter that his behavior changed significantly since this incident. That he is afraid of going outside. He no longer drops her off at work. He certainly no longer pays her cable bill. He no longer picks up his grandchildren, and rightly so. . . .

---

**4.** On this count, the circuit court instructed the jury that

> [t]he defendant is also charged with the crime of assault with intent to maim, disfigure or disable and in order to convict the defendant, the State must prove that the defendant struck at the victim and that the defendant intended to permanently maim, disfigure or disable the victim and that the striking or, in this case it would be biting, if that's the allegation, that it was committed without justification or mitigation.
>
> Maim, m-a-i-m, maim means to cripple or to inflict an injury that deprives the victim of the effective use of any limb or member of the body. Disfigurement has its common, ordinary meaning and disable means to incapacitate or physically impair the victim.

**5.** We cannot fault appellant's counsel for discussing the evidence; since it was erroneously admitted, counsel had no choice but to attempt to minimize its effect.

So there is a reason for this man's behavior to change after this attack. There is a reason for him to be afraid to go in public places. There is a reason for him to not to feel safe anymore and to just want to hole up and hide in a corner.

We have determined that the aforementioned evidence was irrelevant. It could not aid the jury; it could only improperly influence it or have no effect. We cannot say that the comments were harmless but, rather, served, from our perspective, to cloud impermissibly the jury's understanding of the term disable, especially given that assault with intent to disable is a specific intent crime. *See Ford v. State,* 330 Md. 682, 702, 625 A.2d 984 (1993).

## II(A).

Appellant contends that the circuit court's failure to rule on the admissibility of appellant's prior convictions for purposes of impeachment before he made an election whether to testify coerced his decision not to testify. This issue must be discussed in context; consequently, we shall quote extensively from the proceedings before the circuit court.

The case was called for trial on June 20, 1995. Counsel for appellant advised the circuit court that counsel had two motions to present and inquired as to whether she should do so after the selection of a jury. The circuit court stated, "I prefer to do everything possible so that when, once the jury process starts, they [the jurors] don't wait. So, what do you have in mind?" Counsel for appellant then announced that she wanted a ruling as to appellant's "impeachables, any impeachables that the State has," and explained to the circuit court that the admissibility of certain crimes would have a bearing on whether appellant elected to testify. The circuit court then asked counsel for the State if the circuit court was required by law to rule on the matter "before the defendant makes the election [to testify]." Counsel for the State advised the circuit court that it did not have to rule on the motion until after appellant had made an election. On this point, neither

party brought any legal authority to the circuit court's attention. The circuit court then stated:

Well, I know what the rules say. All right. Then I am going to hold in abeyance that ruling, and I'll expect each of you to give me some brief memo, nothing big or formal; it can be a page or two. But as far as I know, and I might be wrong, there is no appellate authority that says when the trial judge must conduct that hearing relevant to the defendant's election. Obviously it has to be made before they're referred to by counsel in cross or direct.

The circuit court continued and stated that it was "inclined" not to rule until after appellant made his election, requested from each side a memorandum on the matter, and deferred ruling until a later time. The circuit court further stated that it understood why appellant, on the one hand, would want a ruling prior to his election and why the State, on the other hand, would not want appellant to have the benefit of the ruling prior to his election. The circuit court concluded by stating, "It's a question of fairness and a question of whether there's been an appellate ruling one way or the other."

On June 21, 1995, the circuit court again referred to appellant's request for a ruling on the admissibility of his prior convictions and stated:

Also, I think the defendant is moving to have the court to determine the admissibility of the defendant's previous record, parts of it, before the defendant makes the election, and the court's ruling on that is that the court will not make that, conduct that hearing until after the defendant has made the election. After the defendant has made the election to testify or not testify, if that election is to testify, then the court will hold the hearing out of the presence of the jury to determine the admissibility or inadmissibility of his previous record.

Six days later, on June 27, after the close of the State's case, appellant was advised of his right to testify or to remain silent. The following colloquy occurred:

THE COURT: You do not have to make your decision now. You don't have to make that decision until there's nothing else to do in your case. So, it's up to you.

THE DEFENDANT: I don't think—I have one question.

THE COURT: Do you want to talk to your lawyer, or—wait a minute. Ask the question, whatever you want to do.

(Ms. Gering [counsel for appellant] conferred with the defendant).

MR. CHIU [counsel for the State]: I would proffer what evidence the State has as to impeachable crimes.

THE COURT: No. Because I have already ruled that I am not going to conduct that hearing until after the defendant has made an election.

MR. CHIU: Your Honor, at this time may I proffer to the defendant what convictions he has?

THE COURT: You can, you can do whatever you want.

MR. CHIU: I have true test copies of convictions of theft, arrest date—the dates I am going to give are arrest dates—5/31/89, theft; September 7th, 1988, theft; March 23rd, 1987, theft; May 14, 1986, theft; April 17, 1986, theft.

The circuit court then addressed the defendant as follows:

As to which, if any, of those crimes I would say are admissible, or would be admissible, you would not know until after you've decided to testify or not testify. And if you decided to testify, after you have taken the stand, and been sworn as a witness, and given your name, then I will excuse the jury and then I'll determine which of these prior convictions, if any, will be admissible.

Immediately thereafter, appellant and his counsel conferred off the record. Back on the record, appellant's counsel once again implored the circuit court to "hold that balancing test now so that he [appellant] can make an educated decision as to whether or not he wants to testify." Although the circuit court acknowledged that it understood appellant's "concerns," it stated, nevertheless, that the law did not compel such a hearing and continued, "I think in fairness to the State, that

decision not be made." The circuit court proceeded to deny the motion, and in support thereof stated that it had balanced all of the equities before it but had not found any authority that compelled it to grant appellant's request.

On June 28, counsel for appellant advised the circuit court that the defense would not call any witnesses and that appellant would make his election. When the circuit court asked appellant for his decision, appellant informed the circuit court that he had not decided, and explained at some length that he had made a change in his life, that he had been going to college the last four or five years, and that he was supposed to graduate within a month. In relevant part, appellant stated:

[I] would like to testify, you know, because maybe I can stress a point to the jury that they didn't see. But in the same token, I don't want to be tore [sic] apart and made into a criminal.

He went on to point out that, if he had been a criminal in the past, he was not one at the time of trial and that, prior to the arrest that gave rise to the proceedings in question, he had not been arrested since 1986.

The following discussion ensued.

THE COURT: M[s]. Gering, have you explained to Mr. Williams the rule that governs the admissibility of previous convictions?

MS. GERING: I talked to him about the balancing test, about the thefts and my hope that it would not be used against him because—

THE COURT: And the time limits?

MS. GERING: Yes. Fifteen years.

. . . . .

MR. CHIU: Your Honor, as I hear his response, first he said he couldn't make a decision, but in this little speech there he did say that he did want to testify. I think at this stage we have to assume that he does want to testify. I—

MS. GERING: Wait a minute.

THE COURT: No. I'm not making that assumption at all.

MR. CHIU: Well, follow me, though? And at which point I would then tell Your Honor what the impeachables are, and you can make your ruling, and he can change his mind about his election—

THE COURT: No.

MR. CHIU:—and once he makes that decision—

THE COURT: No. That's not how I intend to do it. I believe, and I asked counsel for authority before and neither attorney has provided this court with any authority, for the proposition that the court must conduct a hearing before the election or authority for the converse, that the court can conduct the hearing before or after the election, and no authority has been given to the court. I don't know of any, and I think it's an open question, and I have put some reasons on the record. My reasons previously, but my decision is that I think the law is that the court has the option of conducting the hearing before the election or after the election. And my option is to conduct the hearing after the election.

And the election would have to be an irrevocable election or the whole issue is pointless. Therefore, the procedure would be, the jury would be called out, the defendant, if he elects to testify, the defendant would take the stand, be sworn, give his name and address, then the jury would be told to go back into the jury room. Then the court would conduct the hearing and the court would then decide which, if any, of the previous convictions are admissible. Then the jury would be brought back in, the defendant would give his testimony and then be cross-examined. That's the only [way] that I'm—that's the way that I'm going to do it.

The circuit court then gave appellant additional time within which to review documents that counsel for the State had provided to him relating to his prior convictions. When called upon to make his election, appellant repeated that he was undecided and that the ten minutes provided to him by the circuit court was insufficient for him to make his decision. The circuit court responded that, "Normally it [the decision to

testify] takes ten seconds," and then requested counsel for the State to put appellant's convictions on the record. Counsel for the State complied.

May 31st, 1989, theft.... September 7, 1988, misdemeanor shoplifting.... March 23, 1987, auto theft.... April 17, 1986, theft.... May 14, 1986, misdemeanor theft.... April 17, 1986, theft under $300.00.... [A]pril 10, 1986 malicious destruction.... [F.]ebruary 15th, 1984, possession of cocaine ... February 14th, 1984 unauthorized use, which is joyriding and possession of a concealed deadly weapon, to wit, a knife....

The circuit court again inquired as to appellant's decision.

THE DEFENDANT: I'm going to testify.

THE COURT: Very well, sir. Go to the stand and be sworn. Go ahead.

THE DEFENDANT: I would like to know which you, what you—

THE COURT: I've told you that you won't know until after you start testifying what my decision is.

MS. GERING: He said he would not do the balancing test, Mr. Williams, until you take the stand. But then if you do, he's saying you have to testify.

THE DEFENDANT: Huh?

MS. GERING: If you do, he's saying you have to testify. We will have the hearing about the balancing, and he may allow all those convictions in, and then you will have to testify at that point. There will be no backing out at that point is what I'm saying.

The record reveals that counsel for the State attempted to provide appellant with greater leeway.

MR. CHIU: I would like to say for the record that once the balancing test is done, M[s]. Gering is advising her client that he then has to testify. We can't force him to do anything. I mean, he's on the stand—

THE COURT: I am forcing him to make his election.

MR. CHIU: Exactly.

THE COURT: And the way that will be done is, he'll go to the witness stand now, and the jury will come out, and then he will be given the oath and he will be sworn and give his name and address. The jury will see he's elected to testify, and then out of the presence of the jury, we'll conduct this hearing.

MS. GERING: Your Honor, he then is saying he's forced to testify. You're saying he has the right to—to—

MR. CHIU: After that, he can do anything he wants.

THE COURT: I am saying—

MS. GERING: Based upon your decision—

THE COURT:—once he has said he is going to testify, and he takes the witness stand and he's sworn, then he's going to be a witness. No one's forcing him to do that. He's elected to do that.

MS. GERING: The problem is, he's not making an informed decision based on what he knows is going to happen. And it's—

THE COURT: Exactly. I am ruling he cannot make an— he—I'm ruling he does not have the legal right to make an informed decision. All he's entitled to know is, what everybody else knows, and that is what the law is, what his convictions are, and what the court can do and what the court cannot do, and what the court might do and might not do. And he knows all of that now.

MS. GERING: Can I state something for the record?

THE COURT: Sure.

MS. GERING: That we're objecting to that decision by Your Honor, because it obviously infringes on his right against self-incrimination.

THE COURT: M[s]. Gering—

MS. GERING: Against his right to make—

THE COURT: M[s]. Gering, we've—

MS. GERING:—a decision.

THE COURT:—going over this ten times. You maintain that the court must or should conduct the hearing before

the defendant's election. I have ruled against you. We've been over that.

MS. GERING: I'm just preserving the record, Judge.

THE COURT: Okay. And now I'm saying again what must be for the fifth or sixth time, I want the defendant to make his election now. I'll conduct a hearing after he has made his election. So he can decide to testify or not testify. Yes?

THE DEFENDANT: If I took the stand, Your Honor, will be able to say what I want to say, would I be able to just speak?

THE COURT: Oh, no, sir.

THE DEFENDANT: Or would I just be cross[-]examined by the State?

THE COURT: No, sir. You'll be like, you'll be like every other witness. You will not be able to volunteer any information. Your lawyer will ask you questions, and then the State will ask you questions, and I might or might not ask you questions. And the jury might ask questions. You'll be like any other witness on the stand.

THE DEFENDANT: Are you saying I can't voluntarily speak—

THE COURT: Correct.

THE DEFENDANT:—to the jury and—

THE COURT: Correct. You cannot. You have an attorney and either you or your attorney speaks to the jury, but not both.

THE DEFENDANT: Well, if I can't voluntarily speak, then I wish not to take the stand. I thought that I would be able to explain in my version as far as I can tell from the records of what happened in this situation, but—

THE COURT: You will be able to answer all of the questions that your lawyer asks you subject to the right of the State to object. If, if she asks you a question and the State doesn't object, you can answer. If she asks you a question and the State objects and I overrule the objection,

you can answer. If she asks you a question and the State objects and I sustain the objection, you will not have to answer. You will not be able to answer because she will not be able to ask the question. If a juror or alternate asks a question, we go through the same process. They'll ask you the question, either lawyer can object. If I sustain an objection; no question; if I overrule the objection, then you have to answer. So, you're like any other witness once you get on that witness stand, but you cannot just start speaking and give a talk from the witness stand.

THE DEFENDANT: May I speak to my attorney?

THE COURT: Absolutely. Go ahead. Talk to your lawyer.

(Pause while defendant conferred with M[s]. Gering).

THE COURT: Are you still conferring with your lawyer?

THE DEFENDANT: I've decided I'm not going to take the stand, Your Honor, because I might—

THE COURT: Stand up, please, sir.

THE DEFENDANT:—I might—I've decided not to take the stand because I don't want to be made up as a monster that I'm not. You know, I'm trying to be a productive person in society, and I got involved in this incident, and I don't want to do anything to throw my life away, you know.

## II(B).

■ We begin our analysis by examining Maryland Rule 5–609(a), which governs the admissibility of prior convictions for purposes of impeachment of any witness.

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

Other subsections of the Rule provide further constraints on the admissibility of prior convictions. Most notably, if more than fifteen years has passed since the date of the conviction or if the conviction is not final, it is not admissible. Md. Rule 5–609(b). In other words, if the conviction is final and occurred within fifteen years, and if the crime was an infamous crime or a crime relevant to the witness's credibility, the trial judge must weigh the probative value of the evidence against the danger of unfair prejudice.[6]

 The Court of Appeals, in *Jackson v. State*, 340 Md. 705, 668 A.2d 8 (1995), discussed the probative-prejudice weighing process required under Rule 5–609. The Court's specific holding was that the decision to permit "same-crime impeachment [i]s within the trial court's discretion, and that prior convictions for offenses that are similar or identical to the charged crime are not per se inadmissible." *Id.* at 707–08, 668 A.2d 8. The trial court had denied the defendant's motion *in limine* with respect to his prior theft conviction, and ruled that if the defendant elected to testify at trial, the prior theft conviction would be admissible for purposes of impeachment under Rule 5–609. *Id.* at 709, 668 A.2d 8. The defendant did testify, and evidence of the prior theft conviction was admitted. The Court of Appeals observed that Rule 5–609 was derived from Federal Rule of Evidence 609 and Maryland Rule 1–502. *Id.* at 712 n. 4, 668 A.2d 8. Acknowledging that the Maryland Rule differs from the Federal Rule in some material respects, the Court emphasized that both rules impose the same requirement that the trial judge engage in a balancing process to determine whether the probative value of the conviction outweighs its prejudicial effect. *Id.* at 716, 668 A.2d 8. In light of the similarity of the Maryland and Federal

---

6. Prior to Maryland's adoption of the Rules of Evidence, convictions of infamous crimes were *per se* admissible. *See* § 10–905 of the Courts Article (1995 Repl.Vol.). Section 10–905 was superseded by Maryland Rule 1–502(a), to the extent they conflicted. *Beales v. State*, 329 Md. 263, 273, 619 A.2d 105 (1993). Maryland Rule 1–502 was, in turn, rescinded by the Court of Appeals, effective July 1, 1994, and was replaced by Rule 5–609.

rules, the Court reviewed Federal cases interpreting the Federal rule for guidance in interpreting the balancing prong of the Maryland rule. *Id.* The Court cited *United States v. Mahone,* 537 F.2d 922, 929 (7th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976), as an example of the guidelines that numerous courts across the country have adopted. *Jackson,* 340 Md. at 717, 668 A.2d 8. The *Jackson* Court identified five factors:

> (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility.

*Id.; see Gordon v. United States,* 383 F.2d 936, 940 (D.C.Cir. 1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968); *Mahone,* 537 F.2d at 929. The *Jackson* Court was quick to point out that those "factors should not be considered mechanically or exclusively... they may be a useful aid to trial courts in performing the balancing exercise mandated by the [Maryland] Rule." *Jackson,* 340 Md. at 717, 668 A.2d 8.

In addition, the *Jackson* Court quoted that portion of the *Mahone* opinion wherein the U.S. Court of Appeals for the Seventh Circuit set forth the reasoning undergirding the recommended procedure to be followed.

> In the future, to avoid the unnecessary raising of the issue of whether the judge has meaningfully invoked his discretion under [Federal] Rule 609, we urge trial judges to make such determinations after a hearing on the record ... and to explicitly find that the prejudicial effect of the evidence to the defendant will be outweighed by its probative value. When such a hearing on the record is held and such an explicit finding is made, the appellate court easily will be able to determine whether the judge followed the strictures of [Federal] Rule 609 in reaching his decision.

*Mahone,* 537 F.2d at 929, *quoted in Jackson,* 340 Md. at 717, 668 A.2d 8.

■ The rationale set forth above comports fully with the current rule in Maryland "governing impeachment by evi-

dence of conviction of a crime," whereby the trial judge is required to "weigh the probative value against the unfair prejudice for all convictions used to impeach credibility." *Id.* at 713, 668 A.2d 8. The weighing process must be done prior to ruling on admissibility and, if the trial judge is presiding over a jury, out of the presence of the jury. *Id.* at 714, 668 A.2d 8, citing *Beales v. State,* 329 Md. 263, 270, 619 A.2d 105 (1993).

■ Because all convictions used to impeach credibility, including those historically deemed to be admissible *per se,* are subject to the procedures set forth in *Jackson,* it follows that all bases for objecting to the admissibility of convictions are also subject to the procedure. Specifically, the applicability of the procedure is not limited to an objection that the prior conviction was unconstitutionally obtained.[7]

Having determined the procedure to be followed, we next consider *when* a trial judge should employ that procedure.

---

7. The procedure was originally employed in cases where the prior conviction was allegedly obtained in violation of the defendant's constitutional rights. Judge Orth, writing for this Court, examined the historical context of this procedure in *Johnson v. State,* 9 Md.App. 166, 263 A.2d 232 (1970). In that case, Judge Orth stated the issue as follows:

> The principle of *Burgett v. State of Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319, decided 13 November 1967 is that to permit a conviction obtained without the assistance of counsel or a valid waiver thereof to be used against a person either to support guilt or enhance punishment for another offense is a violation of the right to counsel guaranteed by the Sixth Amendment to the Federal Constitution and applicable to the states by virtue of the Fourteenth. The question is whether this principle applies to exclude evidence of prior convictions offered by the State to impeach the credibility of a defendant testifying in his own behalf.

*Id.* at 168–69, 263 A.2d 232.

Judge Orth concluded that

> the *Burgett* principle serves to exclude evidence of a prior conviction offered for the purpose of impeaching the credibility of an accused testifying on his own behalf when it is established that such conviction was obtained absent representation by counsel or a valid waiver thereof.

*Id.* at 175, 263 A.2d 232.

**26**

Our inquiry begins with Maryland Rules 725 and 736. Maryland Rule 736, which became effective on January 1, 1977, was the successor to former Rule 725.[8] In pertinent part, both rules provided that any defense or objection that is capable of determination without the trial of the general issue may be raised before trial by motion. The Rules also provided that "a motion before trial raising defenses or objections shall be determined before trial unless the court orders that it be deferred for determination at the trial of the general issue...." Rule 725(d)(4) and Rule 736(c).

Through Judge Orth, we discussed former Rule 725 in *Johnson,* wherein he stated:

> Of course, any objection capable of determination without the trial of the general issue may be raised before trial by

---

Having determined that the *Burgett* principle was applicable to the impeachment of a defendant by proof of prior convictions, Judge Orth then enunciated the procedure to be followed:
We hold that it is incumbent upon the defendant, when his objection to evidence of a prior conviction is on the ground that the conviction was constitutionally void to state his reasons to the court to enable it properly to determine the issue. This may be done by him out of the presence of the jury. The court shall then conduct a hearing out of the presence of the jury. At the hearing the State shall first have the burden of producing evidence of a prior conviction, unless admitted by the defendant, sufficient to justify a finding by the court that the defendant has suffered such previous conviction.... When this showing has been made the defendant must produce evidence tending to establish that his constitutional right to counsel was infringed in the prior proceeding at issue.... The State then must rebut the presumption, if it can.... The court shall make a finding on the basis of the evidence thus produced and shall exclude from the trial on the merits any prior conviction found to be constitutionally invalid....
In *White v. State,* 11 Md.App. 423, 274 A.2d 671 (1971), Judge Moylan, writing for us, applied the *Burgett* and *Johnson* principles and held that the trial court should have determined, outside of the jury's presence, the admissibility of one of the defendant's prior convictions when the defendant asserted that his convictions were unconstitutionally obtained. *Id.* at 431–35, 274 A.2d 671.

**8.** Although substantive changes were made to Rule 725 when it was renumbered as Rule 736, those changes are not relevant to our present discussion.

motion. Rule 725 b. Thus, the defendant may challenge, before trial, the admissibility of any prior convictions, which the State intended to offer if he took the stand, by a motion to exclude them stating the reasons therefor, and have a determination prior to trial, unless the court orders that it be deferred for determination at the trial of the general issue. Such determination by hearing prior to trial would afford the defendant the opportunity of knowing what prior convictions would be admitted against him and could be of benefit to him in his decision whether or not to testify in the trial on the merits. It would also tend to make for a more orderly procedure at the trial which could proceed without interruption for a determination of such issue. The procedure at a hearing before trial would be the same as that during trial.

*Johnson,* 9 Md.App. at 178–79, 263 A.2d 232 (footnote omitted).

Current Maryland Rule 4–252(a) is the successor to Rule 736. Subsection (a), not germane here, provides that certain matters shall be raised by motion and, if not so raised, are waived unless the circuit court, for "good cause" shown, orders otherwise. Subsections (d) and (g), which are particularly relevant to the instant discussion, provide as follows.[9]

(d) **Other Motions.**—A motion asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time. Any other defense, objection, or request capable of determination before trial without trial of the general issue, shall be raised by motion filed at any time before trial.

(g) **Determination.**—Motions filed pursuant to this Rule shall be determined before trial and, to the extent practicable, before the day of trial, except that the court may defer

---

**9.** Subsection (e) of Maryland Rule 4–252 provides that "[a] motion filed pursuant to this Rule shall be in writing unless the lower court otherwise directs...." Although appellant's motion in the case at bar, to the extent pertinent, was not in writing, the circuit court's consideration of the motion implicitly dispensed with the writing requirement and became, in effect, the circuit court's direction to proceed otherwise.

until after trial its determination of a motion to dismiss for failure to obtain a speedy trial. If factual issues are involved in determining the motion, the court shall state its findings on the record.

Maryland Rule 4–252 parallels Federal Rule of Criminal Procedure 12. *Kohr v. State,* 40 Md.App. 92, 98, 388 A.2d 1242, *cert. denied,* 283 Md. 735 (1978). Because of the similarity between the two rules, the interpretations and applications of the Federal Rule have added significance for us. *See Jackson,* 340 Md. at 716, 668 A.2d 8.

Federal Rule of Criminal Procedure 12,[10] in pertinent part, provides:

(b) **Pretrial Motions.** Any defense, objection, or request, which is capable of determination without the trial of the general issue may be raised before trial by motion. . . .

. . . . .

(e) **Ruling on Motion.** A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. . . .

We turn now to another decision of the U.S. Court of Appeals for the Seventh Circuit, *United States v. Fountain,* 642 F.2d 1083 (7th Cir.), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981). In that case, the Court had occasion to discuss Federal Rule of Criminal Procedure 12(e) in relation to, among other things, the trial judge's decision to hold a hearing prior to trial only if the defendant committed himself to testifying in the event that the trial judge ruled that the defendant's convictions were inadmissible. *Id.* at 1087. Although the Court did not agree with the defendant that the trial judge erred because of the defendant's agreement that

---

**10.** The Federal Rules of Criminal Procedure are found in Title 18 of the United States Code.

the hearing could be held later, the Court made the observations that follow.

> Presumably, the [trial] court wanted to ensure that the defendant had an intention to testify such that an evidentiary ruling would not constitute a mere advisory opinion. Although requiring defendants to disclose such an intention is consistent with *Cook,* 608 F.2d at 1186[11] that requirement may amount to nothing more than a *pro forma* requirement which can only penalize defendants.
>
> The decision to testify involves many factors. The issue of whether prior convictions will be admitted is a strong factor. But even if such evidence is excluded, other factors affect the decision. To require that defendants 'commit themselves' to testifying could have the effect of penalizing unsophisticated defendants. After all, if a defendant 'commits' himself or herself to testifying but then, for whatever reason, decides not to testify, a court does not have, and should not have, any sanction against that defendant. Thus, sophisticated defendants will eagerly 'commit' to testifying. But unsophisticated defendants, especially if *pro se,* may decline to make such a 'commitment'. We do not see why such defendants should have any less entitlement than sophisticated defendants to an evidentiary hearing. So long as defendants have some intention to testify, those defendants have an interest in the question of whether evidence of prior crimes can be used against them.

*Id.* at 1087 n. 3.

In *United States v. Gatto,* 746 F.Supp. 432 (D.N.J.1990), *rev'd on other grounds,* 924 F.2d 491 (3d Cir.1991), the U.S. District Court had before it a plethora of issues, including a motion for a preliminary hearing on the admissibility, for purposes of impeachment, of one of the defendant's prior convictions. *Id.* at 472. The District Court adopted the five factors set forth in *Gordon,* and subsequently quoted in *Mahone,* to be considered in applying Federal Rule 609 and the

---

11. *United States v. Cook,* 608 F.2d 1175 (9th Cir.1979) (*en banc*), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980).

procedure for employing the same. The District Court, as *Mahone* did before it, quoted the proposition from *Cook* that follows:

Motions *in limine* have proven their value in litigation. They save jury time, and avoid the waste that sometimes results from haste when side-bar matters have to be urged in the course of the trial.

*Cook*, 608 F.2d at 1186. Judge Orth made the same point for our Court in *Johnson*. *See supra* footnote 7.

■ The required procedure in Maryland is that set forth in Maryland Rule 4–252. The Rule does not impart to a defendant the absolute right to a ruling on admissibility prior to testifying. The trial judge should determine whether a question of law is presented or whether additional factual information is needed and, if so, whether the factual question can be satisfied by a proffer. A determination that a preliminary ruling cannot be made does not, in and of itself, coerce a defendant's decision as to whether he or she will testify or remain silent. Similarly, if a trial judge exercises discretion and makes a preliminary ruling, the ruling is not, in and of itself, coercive.

■ Before an unrepresented defendant can validly waive his or her Fifth Amendment right, the "record must show that the defendant was informed of the right; ordinarily, that advice will have to come from the trial judge." *Martin v. State*, 73 Md.App. 597, 602, 535 A.2d 951 (1988). A trial judge may assume that a defendant has been properly advised if represented by counsel unless there is a reason to believe that the defendant is confused or misinformed. There is no concomitant obligation, on the other hand, that the trial judge advise a defendant, even if unrepresented, of the possibility of impeachment by prior criminal convictions should he or she choose to testify. As Judge Wilner, now Chief Judge of this Court, pointed out in *Martin*, a trial judge would not know enough to evaluate the threat of impeachment and,

[l]aying out in any significant detail the range of hazards faced by a defendant who subjects himself to cross-examina-

tion by a skillful prosecutor can very easily chill a defendant's desire to tell his side of the story; too brief a summary, conversely, can lure a defendant into dreadful self-incrimination.

*Id.* at 603–04, 535 A.2d 951.

If a trial judge, nevertheless, advises a defendant as to the State's right to impeach him or her with respect to prior criminal convictions, the trial judge has the obligation to do so correctly. In *Morales v. State,* 325 Md. 330, 600 A.2d 851 (1992), the Court of Appeals elaborated on this point. In that case, the trial judge informed a defendant, unrepresented by counsel, as to his Fifth Amendment right. The trial judge then correctly advised the defendant that the State had a right to cross-examine him with respect to prior criminal convictions, but erroneously implied that he could be automatically impeached with all of his prior convictions.[12] *Id.* at 339, 600 A.2d 851. The Court of Appeals noted that the "decision whether or not to testify is a significant one and must be made with a basic appreciation of what the choice entails." *Id.* at 335, 600 A.2d 851. As a factual matter, the criminal defendant who "knowingly and voluntarily elects to proceed without counsel and manage his or her own defense" "relinquishes . . . many of the traditional benefits associated with the right to counsel." *Id.* at 337, 600 A.2d 851; *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975).[13] Among those benefits is counsel on the admissibility of prior convictions for impeachment. *See Morales,* 325 Md. at 337,

---

12. The record revealed that some of the prior convictions were inadmissible as a matter of law and not subject to the exercise of discretion.

13. The trial judge is not, however, completely relieved of obligation, for when

> it becomes clear to the trial court that the [represented] defendant does not understand the significance of his election not to testify or the inferences to be drawn therefrom and where the presumption [that the defendant's counsel has informed the defendant of his rights] is rebutted . . . the court [must] advise the accused of his right to testify or to remain silent.

*Gilliam v. State,* 320 Md. 637, 652–53, 579 A.2d 744 (1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).

600 A.2d 851. When the trial judge undertook to inform the defendant of matters pertaining to impeachment, however, the trial judge had an obligation to do so correctly. *Id.* at 338, 600 A.2d 851. Consequently, "the defendant's decision to waive his constitutional right to testify and to exercise his constitutional right to remain silent was not knowingly and intelligently made." *Id.* at 339, 600 A.2d 851.

 In sum, when a trial judge is faced with an objection to the admissibility of prior criminal convictions for impeachment of a *witness,* including a defendant, the trial judge must employ the balancing process mandated by Maryland Rule 5–609, as clarified in *Jackson,* and if presiding over a jury, must conduct a hearing on the matter out of the jury's presence. A trial judge has an obligation to advise an unrepresented *defendant* with respect to his or her Fifth Amendment rights. A trial judge has no obligation to advise a *defendant,* whether or not represented by counsel, with respect to the possibility of impeachment if the defendant elects to testify, but, if the trial judge undertakes to do so, he or she must do so correctly. The mechanism by which a party may request a preliminary ruling on various matters, including the admissibility of prior convictions for purposes of impeachment, is set forth in Maryland Rule 4–252 and the analogous Federal Rule of Criminal Procedure 12. The Maryland Rule requires that the trial judge make a pretrial determination as to whether the request is capable of being decided either before trial or before the receipt of certain evidence. If the issue is one of law, or if the issue is such that a sufficient factual context exists for the trial judge to exercise his or her discretion, *e.g.,* a proffer of evidence, the trial judge should then proceed to exercise discretion and make a ruling. If, on the other hand, there is an insufficient factual basis for the trial judge to exercise discretion, he or she should so determine and advise the parties. If the trial judge rules on the motion, he or she should, whenever practicable, state for the record the reasons for the ruling.

In the case under review, the trial judge did not comply with Maryland Rule 4–252. He chose not to exercise his discretion until after appellant made an irrevocable election to testify and did not base his decision on the need for additional information.

We should point out that, if a defendant elects to remain silent even in reliance on the trial judge's ruling or failure to rule on a motion *in limine,* the ruling ordinarily will not be preserved for review absent an error of constitutional dimension. Generally, preservation for review requires a question of law not dependent upon a factual predicate or a discretionary ruling. Additionally, if a defendant or other witness testifies and the State does not impeach him or her with the prior conviction or convictions, the ruling ordinarily will not be preserved for review.

In *Jordan v. State,* 82 Md.App. 225, 571 A.2d 238 (1990), *aff'd in part and rev'd in part,* 323 Md. 151, 591 A.2d 875 (1991), we held that the question of whether the circuit court erred when it ruled that the State could impeach the defendant with a statement that he made to peace officers, after granting a motion to suppress its use during the State's case-in-chief because it had not established that the defendant had knowingly and voluntarily waived his right to counsel, was not preserved for our review because the defendant elected not to testify and the State did not use the statement. *Id.* at 230–31, 571 A.2d 238.

Ten years earlier, in *Offutt v. State,* 44 Md.App. 670, 410 A.2d 611 (1980), *cert. denied,* 291 Md. 780 (1981), Judge Thompson recited for us the justification for the general rule of non-preservation. The facts in that case revolved around a defendant who, when informed by the trial judge that the defendant's prior conviction for distribution of heroin would be admissible for purposes of impeachment, elected not to testify. *Id.* at 677, 410 A.2d 611. Judge Thompson explained that no court in the country

> recognized a ruling on a motion *in limine* as sufficient to constitute reversible error. We adhere to that rule. Al-

though it is entirely possible that the ruling of the trial judge motivated the appellant not to testify, it is also possible that he had no intention of testifying regardless of the ruling of the trial court on the motion. It is also possible that had appellant testified the State would have changed its position and not used the conviction. We do not rule on academic questions.

*Id.*

Ten years after we handed down *Offutt,* Judge Bishop, writing for us in *Passamichali v. State,* 81 Md.App. 731, 569 A.2d 733, *cert. denied,* 319 Md. 484, 573 A.2d 808 (1990), delineated the contours of an exception to the general rule.[14] In that case, the defendant challenged the mandate found in § 10–905 of the Courts Article that evidence of conviction of an infamous crime is *per se* admissible. We held that the issue *was* preserved for appellate review, even though the defendant did not testify, because it presented a pure question of law without a need for a factual predicate.

It defies logic to suggest that a defendant must testify in order to preserve for appellate review a claim of deprivation of the constitutional right to testify. If such a requirement existed, this constitutional challenge could never be squarely presented for appellate review because the claim would dissipate upon the defendant's taking the oath [and testifying upon direct].

*Id.* at 740, 569 A.2d 733.

We distinguished *Passamichali,* in *Jordan,* and stated that the trial judge in *Jordan* may have changed his ruling or the defendant's testimony may not have produced the factual predicate that would have permitted use of the statement for purposes of impeachment. *Jordan,* 82 Md.App. at 233–34, 571 A.2d 238. We observed that this is particularly true where no proffer was made as to the expected testimony. *Id.* at 234, 571 A.2d 238. Moreover, we pointed out that the defendant obtained the relief that he sought, namely, suppression.

---

14. *See also Morales* and *Martin, supra* at pages 30–32.

The court's ruling that the statement is nevertheless usable for impeachment purposes should appellant testify is in the nature of an advisory opinion. As we see it, its applicability in a particular case cannot be determined until appellant has testified; only then will it become apparent whether any-thing, requiring impeachment, has developed.

*Id.* at 231 n. 4, 571 A.2d 238. The Court of Appeals, in affirming a portion of the judgment, held, in relevant part, that the rules governing preliminary rulings do not authorize appellate review unless the evidence is ultimately produced at trial. *Jordan v. State,* 323 Md. 151, 159, 591 A.2d 875 (1991).

Federal jurisprudence on this point is congruent with that of Maryland. *See Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), *quoted in Jordan,* 82 Md. App. at 232–33, 571 A.2d 238. In *Luce,* a defendant charged with federal drug law violations elected not to testify after the trial judge ruled, pursuant to Federal Rule of Evidence 609(a), that the defendant's prior conviction fell within the category of permissible impeachment evidence but that a factual predicate was necessary in order to make a specific ruling. *Id.* at 39–40, 105 S.Ct. at 462–63. The defendant did not commit to testify in the event the trial judge granted his motion *in limine,* neither did he proffer to the trial judge the substance of his testimony. *Id.* Chief Justice Burger announced for the Su-preme Court, and thereby resolved a matter of conflict among the Federal Circuits, that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 43, 105 S.Ct. at 464.

We reach the issue in this case because it is one of constitutional dimension. Appellant was coerced with respect to his decision not to testify because the circuit court incor-rectly advised him with respect to the applicable law and employed an erroneous procedure. *See Morales, supra* at pages 31–32. Generally, a defendant does not waive his or her Fifth Amendment right against self-incrimination merely by taking the witness stand and reciting the oath. A defendant waives that right when he or she testifies on direct examina-

tion; once the direct examination commences, the defendant may not then seek to cloak himself or herself with the mantle of the Fifth Amendment, and he or she may then be cross-examined on matters made relevant by the testimony given on direct. *Brown v. United States*, 356 U.S. 148, 154–57, 78 S.Ct. 622, 626–28, 2 L.Ed.2d 589 (1958); *State v. McKenzie*, 17 Md.App. 563, 571–576, 303 A.2d 406 (1973).

In *McKenzie*, Judge Moylan, writing for this Court, thoroughly reviewed the history of the privilege against self-incrimination. As he noted:

The defendant who takes the stand of his own free will subjects himself to the risk of future cross-examination by the prosecuting attorney or by the court, a stage at which the element of compulsion does attach.... A defendant need not waive anything in order validly to testify; he only waives the right against later compulsory cross-examination....

Indeed, the voluntary assumption of the witness stand by an accused, to testify in his own defense, is, *ipso facto*, all the waiver that is required of the privilege against subsequent cross-examination, to wit, against compulsory self-incrimination....

[T]he Maryland cases have flatly accepted the universal principle that a defendant who voluntarily testifies in his own behalf subjects himself, like any other witness, to cross-examination, and, thereby, waives his privilege against compulsory self-incrimination.

*Id.* at 572–76, 303 A.2d 406.

Returning to the case at bar, we hold that the trial judge (1) abused his discretion by requiring appellant to be sworn in front of the jury solely for purposes of making an "election" and not to provide a factual predicate and (2) erroneously advised appellant that once sworn in front of the jury, his "election" was irrevocable regardless of the nature of the trial judge's ruling on the admissibility of appellant's prior convictions. The trial judge could *not* have compelled appellant to testify *unless* appellant voluntarily, knowingly, and

intelligently chose to testify, *and* testified on direct examination. Moreover, the trial judge could not have remedied the resultant prejudice if appellant had taken the stand, recited the oath in front of the jury, and then, outside of the jury's presence, elected not to testify. The jury would have been left without an adequate explanation for appellant's mysterious disappearance. As in *Morales,* appellant's decision was not "knowingly and intelligently made." *Morales,* 325 Md. at 339, 600 A.2d 851.

### III.

Appellant's next allegation of error pertains to his robbery conviction. He contends that the circuit court erred when it denied his motions for judgment of acquittal on this charge because "[t]here was no evidence . . . that he took and carried away any amount of money from Mr. Caple." In other words, appellant suggests, "[T]here being no asportation, there was no robbery."

Caple's testimony, received at trial, appears, at first glance, to support appellant's contention. Although there was some discrepancy as to how much money Caple held in his hand when appellant attacked him, there was no dispute that when appellant grabbed at the currency in Caple's hand, the currency tore in half; Caple retained one-half of the torn currency and appellant possessed the other.

Q And at that time [at the preliminary hearing] you said [that you had] $80.00, didn't you?

A I said I had—I wasn't for sure what was in my hand, because I went there to pay a bill for my daughter. I said [$]80? But Mr. Williams, he said it was $60.00 because when he attacked me, he tore the money in two. I had half of the money and he had the other half.

. . . . .

A Yes, I were mistaken if he said he have [$]30. When the people took the money from me at the cable company to tape it together to pay the bill, they said it was—Mr. Williams is the one that said it was $60.00.

Q You, money was taken from you. Is that correct?

A Half of it.

The jury did not hear any evidence concerning the value of the torn currency. The circuit court adroitly pointed out to counsel that omission.

> THE COURT: No. I don't think you can tell them [the jurors] what the law is if it's different than what the instructions are. I didn't tell them anything about what the value legally is of a half of a bill. There's no law, there's no evidence in this case that a half of a bill is worth something or not worth something.

▆▆ Robbery is the felonious taking and carrying away of another's property, of any value whatsoever, by violence or the putting in fear. *Spitzinger v. State,* 340 Md. 114, 121, 665 A.2d 685 (1995); *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056 (1991).[15] Judge Rodowsky discussed for the Court of Appeals, in *Jupiter v. State,* 328 Md. 635, 616 A.2d 412 (1992), the complexities attendant to the question of value.

> [T]he value requirement is rarely an issue and it is difficult to hypothesize an illustration of when it might be an issue. If, for instance, a person asks another for the time of day, and the other refuses, but the person who inquired learns the time by glancing at the other's watch, the one who looked at the watch has not committed theft because that person did not take property of value. If an accused

---

**15.** In Maryland, robbery is a common law offense. *See Eldridge v. State,* 329 Md. 307, 316, 619 A.2d 531 (1993). *But see Kearney v. State,* 48 Md. 16, 23 (1877) (§ 486A creates an offense not recognized at common law). The General Assembly has prescribed the penalties for robbery, as set forth in Article 27, §§ 486 and 488. *Eldridge,* 329 Md. at 316, 619 A.2d 531; *Butina v. State,* 4 Md.App. 312, 317 n. 1, 242 A.2d 819 (1968), *cert. denied,* 251 Md. 748 (1969).

In criminal information # 594320052, the State charged appellant with robbery under Article 27, §§ 486 and 487—not under the common law. Although appellant filed a standard motion to dismiss, pursuant to Maryland Rule 4–252, and requested that the circuit court dismiss the "Criminal Information and/or Indictment information" because it was defective, appellant did not raise that issue below and does not raise it here.

held a gun to a victim's head to force the victim to divulge the time, arguably the accused did not commit *robbery,* for the same reason.

Decisions in analogous cases show that there is no requirement that the defendant deprive the victim of value; the requirement is simply that the defendant deprive the victim of possession of property of value.

*Id.* at 640–41, 616 A.2d 412. As Chief Judge Wilner explained for us, a crime or attempt to commit a crime cannot be legally charged where the object of attention is without value. *Stackowitz v. State,* 68 Md.App. 368, 511 A.2d 1105, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986). The issue in *Stackowitz* was whether a charging document that declared that the property at issue, "having a value of none," stated a criminal offense. *Id.* at 370–71, 511 A.2d 1105.

It thus follows, at least as a matter of statutory construction if not in a more fundamental jurisprudential sense, that a person cannot be convicted of theft for taking or assuming control over something that has no value whatever. And, given the nature of the crime of attempt, if stealing something that has no value is not a crime, it further follows that attempting to steal something that has no value is likewise not a crime.

We are spared in this case the need to ponder the abstraction of whether there can, in law or in fact, actually be anything of tangible existence that really has no value. We leave that to the economists or to another court....

There is a significant difference between a showing that property having some intrinsic value was taken, although the precise measurement of that value is not established, and an affirmative charge that what was taken or intended to be taken was, in fact, valueless.... That there is *some* value ... *is* an element of the crime [of attempted theft], for, if the item at issue [gasoline] has no value whatever, it is not 'property' under the [theft] statute. The difference between zero and something, in other words, is of quite

different character than that between something and something more.

*Id.* at 372–74, 511 A.2d 1105.

The amount of currency taken from a robbery victim is not an essential element of the offense, *as long as* something of value is taken. *Fisher v. Warden,* 224 Md. 669, 670, 168 A.2d 520 (1961). Proof that a greater or lesser sum of currency than that charged in the indictment or information was taken will satisfy the value element. *Oliver v. State,* 8 Md.App. 610, 613, 261 A.2d 498, *cert. denied,* 257 Md. 735 (1970); *Ham v. State,* 7 Md.App. 474, 479, 256 A.2d 362 (1969), *cert. denied,* 256 Md. 745 (1970).

We are not aware of any reported decisions dealing with robbery of mutilated currency. In our quest to resolve this matter, we look to the Code of Federal Regulations for assistance. Section 100.5 of Part 100, Exchange of Paper Currency and Coin, addresses the value of mutilated currency and the methods to redeem the same.

(a) Lawfully held paper currency of the United States which has been mutilated will be exchanged at face amount if clearly more than one-half of the original whole note remains. Fragments of such mutilated currency which are not clearly more than one-half of the original whole note will be exchanged at face value only if the Director, Bureau of Engraving and Printing, Department of the Treasury, is satisfied that the missing portions have been totally destroyed. The Director's judgment shall be based on such evidence of total destruction as is necessary and shall be final.

### Definitions

(1) Mutilated currency is currency which has been damaged to the extent that (i) one-half or less of the original note remains or (ii) its condition is such that its value is questionable and the currency must be forwarded to the Treasury Department for examination by trained experts before any exchange is made.

(2) Unfit currency is currency which is unfit for further circulation because of its physical condition such as torn, dirty, limp, worn or defaced. Unfit currency should not be forwarded to the Treasury, but may be exchanged at commercial banks.

Exchange of Mutilated Paper Currency, 31 C.F.R. § 100.5 (1995).

Caple testified that each man possessed one-half of the torn currency. We shall have to assume, then, that during the struggle, the currency was torn exactly in half.[16] Under the provisions of § 100.5, if the currency had been torn in unequal portions, the man possessing the larger portion would have possessed "legal tender," as that term is commonly understood. The man possessing the smaller portion would only have had pieces of paper with which he could, if he so chose, file a claim with the Director of the U.S. Bureau of Engraving and Printing for redemption. Of course, there would be no guarantee that he would sustain his burden of proof and receive whole currency in return for his efforts. *See Krigel v. United States*, 229 Ct.Cl. 73, 662 F.2d 741 (1981) (per curiam).

Because the currency was torn in half, it cannot be said that appellant robbed Caple of $60 to $70. On the other hand, it is undisputed that appellant robbed Caple of his mutilated currency, which, because of its mutilated condition, may have lost the value that it was originally endowed with but retained, nonetheless, some value. *Felkner v. State*, 218 Md. 300, 146 A.2d 424 (1958); *Ham v. State*, 7 Md.App. 474, 479, 256 A.2d 362 (1969). The property had value, for with it, appellant could have, although he would not have been the rightful owner, attempted to receive substitute currency from the Director of the U.S. Bureau of Engraving and Printing. We must conclude then, that after viewing the evidence adduced at trial in the light most favorable to the prosecution, any rational trier of fact could have found the essential

---

**16.** According to Caple, representatives of the business that he was calling upon taped together the torn portions of the currency that he retained with those that appellant had relinquished.

elements of the crime of robbery beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Matthews v. State,* 106 Md.App. 725, 743, 666 A.2d 912 (1995).

## IV.

Appellant asks us to reverse his convictions for, respectively, malicious biting with intent to mark or disfigure and malicious biting with intent to maim, disfigure, or disable because the evidence admitted at trial was insufficient to support the specific intent requirement of said crimes. We are of a different opinion.

Disregarding the evidence relating to Caple's mental state, the State presented sufficient evidence to sustain the conviction on each issue. The State charged appellant with violations of Article 27, §§ 385 and 386. Those sections provide as follow.

**§ 385. Malicious injury to tongue, nose, eye, lip, limb, etc.**

Every person, his aiders, abettors and counsellors, who shall be convicted of the crime of cutting out or disabling the tongue, putting out an eye, slitting the nose, cutting or biting off the nose, ear or lip, or cutting or biting off or disabling any limb or member of any person, of malice aforethought, with intention in so doing to mark or disfigure such person, shall be guilty of a felony and upon conviction are subject to imprisonment for not more than 15 years.

**§ 386. Unlawful shooting, stabbing, assaulting, etc., with intent to maim, disfigure or disable or to prevent lawful apprehension.**

If any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or shall unlawfully and maliciously stab, cut or wound any person, or shall assault or beat any person, with intent to maim, disfigure or disable such person, or with intent to prevent the lawful apprehension or detainer of any party for any

offense for which the said party may be legally apprehended or detained, every such offender, and every person counselling, aiding or abetting such offender shall be guilty of a felony and, upon conviction are subject to imprisonment for not more than 15 years.

Specific intent is an element of each offense. *Bryant v. State,* 83 Md.App. 237, 249, 574 A.2d 29 (1990) ("Statutory maiming, under Article 27, § 385, is . . . indisputably a specific intent crime"); *Williams v. State,* 100 Md.App. 468, 473, 641 A.2d 990 (1994) ("The *mens rea* of assault with intent to maim involves the deliberate intention and willful desire and purpose of inflicting harm on the victim").

 According to the testimony elicited at trial, appellant attempted to sell to Caple a cable television converter box before Caple entered the business; Caple rejected the offer. Once inside the business, which was populated by employees and other customers, appellant waited until Caple reached the payment window and then ordered Caple to turn over his money to appellant. Caple refused, and the melee began.

A Then he [appellant] shoved me. He started shoving, and when he shoved me, you have to go through these ropes like a bank. He shoved me and then I fell. When I fell, he placed his face on my side to try to take the money.

. . . . .

Q And what was he doing with his hands while he was trying to hold you down with his foot?
A He was trying to take the money from me.

. . . . .

Q Okay. Were you letting go of the money?
A No, I didn't let go of the money. That's when I got, and I was able to get up. That's when he started, he attacked and started biting me, he bit me up side my face and bit this finger here. He almost bit it in two.
Q Which finger
A The ring finger. I can't wear my ring anymore.

. . . . .

Q Can you move that finger at all?

A I can move it just a little, just a little bit. I can move it over, but I can't pick it up.

Q What, if anything, else did he do?

A Well, he bit up—see this, I don't know if you can see. I've got a scar where he bit my skin up, broke it.

Q And he also bit your index finger of your left hand?

A Yeah, bit this one. He bit me up side the face.

The evidence presented to the jury was sufficient for it to have found, beyond a reasonable doubt, that appellant intended to disable and disfigure Caple because he resisted appellant's criminal overtures and foiled his "snatch and grab" opportunity. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Matthews v. State*, 106 Md.App. 725, 743, 666 A.2d 912 (1995).

## V.

In light of our decision to reverse the judgments and remand for further proceedings consistent with this opinion, we decline to address the remaining issues.

JUDGMENTS REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.